UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | 1:04-cr-178 |
| v. | ) | |
| | ) | Collier/Carter |
| | ) | |
| CLIFTON OMAR ROBINSON | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant Clifton Omar Robinson has moved to suppress a search of his residence (Doc. Nos. 18 and 20) and one of his vehicles (Doc. No. 30) which occurred on October 19, 2004. Defendant's residence was searched after police obtained a search warrant, and his vehicle was searched after a drug dog alerted on the vehicle. The defendant disputes the validity of the search warrant and the reliability of the drug dog. The District Court has referred defendant's motions to suppress to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the reasons stated herein, it is RECOMMENDED that defendant's motion be DENIED.

II. Facts

An evidentiary hearing was initially held on defendant's motions to suppress on February 16, 2005, in which Deputy Ken Pruitt with the McMinn County Sheriff's Department was the only witness to testify. A second evidentiary hearing was held on December 13, 2005 in which Det. B.J. Johnson and Special Agent Paris Gillette of the Bureau of Alcohol, Tobacco and

1

Firearms (ATF) testified. The delay between the first and second hearings was necessitated by Det. Johnson's deployment to Iraq with his police dog, Brondo.

On October 19, 2004, Deputy Ken Pruitt was dispatched to the Heritage Motel to investigate possible drug activity. A young woman named Jamaica Scruggs answered the door when he knocked. He asked her if anyone else was in the room. She responded "no." He asked for and received consent from her to enter the motel room where he noticed a strong smell of marijuana. Pruitt asked her about the odor, and she stated she had some marijuana under the bed. He found a large bag of marijuana and, at that time, advised Scruggs of her Miranda rights. Upon questioning by Pruitt, Jamaica Scruggs stated her friend, Latoya Gallaher, was Omar Robinson's girlfriend, that Latoya and Omar had fought recently, and that after the fight, she and Latoya broke into Omar's house and stole marijuana. Jamaica explained Latoya was tired of Omar beating on her and wanted to get back at him. Jamaica said Latoya had another bag of marijuana in her apartment. Deputy Pruitt and Jamaica Scruggs proceeded to Latoya's apartment, but LaToya was not home. Jamaica then called Latoya on her cell phone, and Deputy Pruitt spoke with Latoya about the marijuana. Latoya admitted she had marijuana in her apartment and gave her consent for Deputy Pruitt to go inside. The apartment manager opened the door, and Latoya, still on the cell phone, directed Pruitt to the location of the marijuana under her bed. Latoya said she stole it from Omar because she was tired of him beating on her. Pruitt found a large amount of marijuana in a backpack under the bed. Latoya confirmed she was Omar's girlfriend and mentioned something about them having a child together. She said there was more marijuana at Omar's home.

After leaving LaToya's apartment, Pruitt proceeded to Omar's house, but Omar was not there. A neighbor came outside and volunteered that Omar had just left. Pruitt then put out a

bolo (be on the lookout) for Omar's car. Shortly thereafter, a Deputy Wilson called Pruitt and told him officers had located Omar at the Jiffy Store, a gas station about one or one-and-a-half miles away from Omar's house. Deputy Pruitt and Deputy Wilson proceeded to the gas station where they found Omar and spoke with him in the parking lot. They told Omar what Jamaica and LaToya had said and what they had recovered from the hotel and Latoya's apartment and then asked for his consent to search his house. Omar said he didn't know if he would let them search. Pruitt asked him if there was something he was scared of and stated that if there was nothing in the house, "you have nothing to be worried about." Omar responded he had only a small bag of marijuana for personal use and that was what he was scared about. Pruitt told him "if that is all you have, there is nothing to worry about." Omar then refused to give consent to search. At this point, Deputy Wilson detained Omar in the police car.

The conversation among Omar, Pruitt and Wilson had been casual and polite. No guns were drawn and no voices were ever raised. Omar was never told he was not free to leave, nor was he given his Miranda rights. The officers made no threats towards Omar, and he was not handcuffed. Pruitt testified he detained Omar because Omar had admitted he had marijuana in his house. On cross-examination, Pruitt confirmed that he had never met Jamaica or Latoya before October 19, 2004. After Omar's detention in the police car when he was placed under arrest, Omar, Latoya, and Jamaica were transported to the police station where other officers took the women's statements while Pruitt prepared a search warrant for Omar's house. Omar was not Mirandized until after the search warrant for his home had been executed. Prior to October 19, 2004, Pruitt had not conducted surveillance of Omar's house, but he did have information from other officers regarding Omar's house as a possible drug house.

Deputy Pruitt's affidavit, which was used to secure the search warrant at issue, stated in relevant part:

> On today's date after receipt of call from Central Dispatch to # 3 at the Heritage Motel for possible drug traffic, upon my arrival, I talked with a female named Jamaica for a consent to search. Recovered a Blue Bag that contained a large amount of marijuana, at that time I advised her of her rights and she told where she got the marijuana, she stated that her and Latoya Galaher, who is Omar Robinson's girlfriend, and that they went to Omar home and SEE Exhibit A for directions and that they went inside his home that night and took a large amount of marijuana, then I talked to Latoya and she told me that she had more marijuana in her apartment in a light Blue Back Pack. After a consent search on Latoya Galaher apartment recovered a light Blue Back Pack with a large amount of marijuana, Latoya stated _____ front door of his home had been broken and the windows are messed up where they ____ on them, she also stated that she lived there most of the time with Omar and that there was more marijuana in the home _____. Mr. Robinson about the above information and he did state that there was more marijuana in the home.[1]

Pruitt executed the search warrant that same day and found ecstacy, cocaine and marijuana in Omar's house as well as a firearm and ammunition. According to the evidence presented at the February 16, 2005 hearing, and I so find, all evidence in Omar's house was discovered and seized after Deputy Pruitt obtained a search warrant for Omar's house.

Also on October 19, 2004, Det. Johnson and Brondo were dispatched to Mr. Robinson's residence. When they arrived, Johnson ran Brondo through the house. The dog alerted in every room, even rooms where no contraband was later found. Johnson explained that he believed there was residue of illegal substances throughout the house which would explain why Brondo alerted in every room. Located outside on the premises of the house were at least three vehicles. While other officers observed, Johnson had Brondo conduct a sniff around each of the vehicles.

---

[1]This quoted section of the affidavit was handwritten and contained many grammatical and punctuation errors. The blanks indicate portions which were not legible to the undersigned Magistrate Judge.

4

The dog alerted on only one of the vehicles: first, on the right front fender well and door seam and second, on the driver's side fender well and door seam. Johnson informed Pruitt of this alert and Pruitt was eventually able to find keys inside the vehicle, and a search was commenced. Johnson was not involved in the actual search of the vehicle. A large amount of cash and cocaine was found inside the vehicle, and the car was impounded.

Det. Johnson has had Brondo since 2000 when Johnson was a deputy with the Rhea County Sheriff's Department. In 2002, Johnson and Brondo went to work for the McMinn County Sheriff's Department until leaving for Iraq in 2005. Brondo is a seven year-old Dutch Shepard. Prior to leaving for Iraq, Brondo was used primarily as a drug detection dog and as a tracker. In Iraq he was used to track insurgents and to detect explosive devices. Brondo is and was on October 19, 2004, certified by the National Narcotic Drug Dog Association to detect illegal drugs and to track persons. Certification involves an annual week long process during December in which instructors observe dogs and their handlers undergo numerous tests which must be completed successfully before receiving annual certification. Johnson testified that in addition to annual certification, he has always tested and trained his dog on a weekly basis by running Brondo through exercises to find hidden contraband.

In response to the defendant's discovery requests, the government provided the defendant with Johnson's traffic logs of all traffic stops he made between December 9, 2002 and November 18, 2004 while employed by the McMinn County Sheriff's Department. The log shows, *inter alia*, the date and time of the traffic stop, the reason for the traffic stop, and the action taken. If Brondo was involved in the stop, Johnson has so indicated by writing "K-9" next to the entry. However, the log does not indicate whether Brondo made an alert on the vehicle stopped and if

5

so, whether contraband was discovered. Furthermore, if an arrest was made, the log usually does not indicate why an arrest was made.

Finally, the defendant entered into evidence a letter dated May 18, 2005 from Jerry Estes, District Attorney General for the Tenth Judicial District of Tennessee, to McMinn County Sheriff Steve Frisbee concerning B.J. Johnson. In this letter, Mr. Estes informed Sheriff Frisbee he would no longer prosecute cases in which Johnson was an essential witness due to ethical concerns he had about Johnson, in particular concerns pertaining to allegations that Johnson had stolen from a drug fund. Estes further stated the Tennessee Bureau of Investigation (TBI) was conducting an investigation into these allegations. At the December 13, 2005 hearing, ATF Special Agent Paris Gillette testified he had spoken that morning with TBI agent Dan Ogle assigned to the Johnson investigation. Ogle told him that the investigation was winding down and there had been no merit found in the allegations against Johnson. Johnson himself testified that when Estes made allegations against him, Sheriff Frisbee "stood behind" him.

### III. Law and Argument

*A. The Search of Defendant's House*

The defendant argues Deputy Pruitt's search warrant affidavit fails to establish probable cause because the information in the affidavit obtained from Latoya Gallaher, Jamaica Scruggs, and Omar Robinson is tainted or flawed in various ways. As to the information from Gallaher and Scruggs, the defendant asserts it was "a) Taken out of context when compared to [their] written statements..., b) unreliable as relayed by Gallagher and Scruggs, [and] c) Insufficiently corroborated." (Defendant's Memorandum in Support of Motion to Suppress at 3). Defendant also asserts his statement about a small amount of marijuana in his home, a statement repeated in the warrant affidavit, cannot be used to support probable cause because this statement was

obtained illegally, *i.e.*, without giving the defendant his *Miranda* rights first. I will address the issue of defendant's own statement first.

When reviewing a search warrant affidavit to determine if it supports probable cause to search, the Court must redact any illegally obtained evidence from the affidavit and consider only the remaining balance of the affidavit in the probable cause equation. *United States v. Shamaeizdeh*, 80 F.3d 1131, 1136 (6th Cir. 1996); *United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir. 1984). Defendant argues his statement must be redacted from the affidavit because it was obtained without giving him his Miranda warnings.

The Fifth Amendment requires Miranda warnings be given where a person is subject to custodial interrogation. *Dickerson v. United States*, 530 U.S. 428 (2000); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). However, the test for determining when a detention has occurred for purposes of the Fourth Amendment and when a custodial detention has occurred for purposes of the Fifth Amendment are not the same. *Berkemer v. McCarty*, 468 U.S. 420, 436-441 (1984); *United States v. Salvo*, 133 F.3d 943, 949 (6th Cir. 1998); *accord United States v. Knox*, 839 F.2d 285, 289-291 (6th Cir. 1988). The test for determining whether a seizure has occurred under the Fourth Amendment is whether a reasonable person in the defendant's position would have felt free to leave, given the totality of the circumstances. For Fifth Amendment purposes, however, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."); *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000) (same). Thus, it is possible for a person to

7

be detained but not in custody for purposes of requiring Miranda rights. *Berkemer v. McCarty*, 468 U.S. 420, 427 (1984). As a general rule, "because of the very cursory and limited nature of a *Terry* stop, a suspect is not free to leave, yet is not entitled to full custody Miranda rights." *Salvo*, 133 F.3d at 949 (relying on *Berkemer*, 468 U.S. 420 and *United States v. Knox*, 839 F.2d 285, 289-291 (6th Cir. 1988)); *see also, United States v. Swanson,* 341 F.3d 524, 528 (6th Cir. 2003) ("The very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights."); *United States v. Phillip*, 948 F.2d 241, 247 (6th Cir.1991), *cert. denied,* 504 U.S. 930 (1992)("Coercive environments not rising to the level of formal arrest ... do not constitute custody within the meaning of *Miranda*.").

Deputy Pruitt and Deputy Wilson approached the defendant in the Jiffy Store parking lot and began talking with him. The conversational tone was polite. No threats were made, no handguns were drawn, and the defendant was not cuffed or told he could not leave. This encounter appears to have been a consensual encounter which does not amount to a Fourth Amendment seizure. *See United States v. Erwin,* 155 F.3d 818, 823 (6th Cir. 1998) ("A law enforcement officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion that a crime has been committed, and asking him whether he is willing to answer some questions.") (citing *Florida v. Royer,* 460 U.S. 491, 497 (1983)). At the most, however, Pruitt's and Wilson's encounter with Omar in the parking lot constituted a valid Terry stop adequately supported with reasonable suspicion furnished by the information obtained from LaToya and Jamaica. Defendant was not placed in custody rising to the level of a formal arrest until after he told the officers there was a small

amount of marijuana in his house. Thus, even under this scenario, Miranda warnings are not required for Omar's statement to be considered in Pruitt's search warrant affidavit.

As for the issue of whether Deputy Pruitt's affidavit supported probable cause to issue the search warrant for Omar's house, defendant's statement that there was a small amount of marijuana in his home, an admission included in Pruitt's affidavit, was sufficient by itself to support probable cause to search the defendant's house. "Probable cause for the issuance of a search warrant is defined in terms of whether the affidavit sets out facts and circumstances which indicate a 'fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. Finch*, 998 F.2d 349-352 (6th Cir. 1993) (quoting *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir.) *cert. denied,* 498 U.S. 387 (1990)); *see also United States v. Couch*, 367 F.3d 557, 560 (6th Cir. 2004) ("To justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place.") (internal citations omitted).  A magistrate's probable cause determination should be made in a "realistic and common sense fashion," *Finch*, 998 F.2d at 351, and is entitled to "great deference." *Couch*, 367 F.3d at 557.  "The task of the reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).

The defendant stated, under non-coercive and non-custodial circumstances, that he had, at that time, marijuana in his house. On the basis of this information alone, the magistrate who issued the search warrant could conclude there existed a fair probability that evidence of a crime would be found in the defendant's house.  Having reached this conclusion, there is no need to

9

consider the defendant's argument concerning why the information from Scruggs and Gallaher failed to establish probable cause to search the defendant's home.

   *B. The Search of Defendant's Car*

"A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Robinson*, 390 F.3d 853, 874 (6th Cir. 2004). The government bears the burden to prove the reliability of a drug dog. *See id.* In this case, the defendant argues the government has failed to prove Brondo is a properly trained dog because the government has failed to prove the reliability and credibility of drug dog Brondo in accurately sniffing out contraband. Specifically, the defendant asserts the traffic logs kept by Det. Johnson fail to establish Brondo's reliability and credibility because the records do not show how often Brondo alerted on a vehicle and whether contraband was actually found in the vehicle. Defendant further asserts that absent such a showing, certification by the National Narcotic Drug Dog Association is insufficient to establish Brondo's reliability and credibility. I disagree. In the Sixth Circuit, the rule concerning the reliability of drug dogs is "after it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications." *Robinson*, 390 F.3d 874 (citing *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir.2004) and *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994). According to the Sixth Circuit, the threshold for establishing the reliability of the dog is certification. *Id.* All other evidence after this certification may be used to undermine or bolster the credibility of the K-9 officer who testifies about the abilities of his dog and about what happened in the particular incident at issue. *Id.* The instant case is similar to *United States v. Diaz*, 25 F.3d 392 (6th Cir. 1994) in which probable cause to search a vehicle was based entirely on a drug dog alert. As in

this case, the defendant in *Diaz* argued that because the handler had no performance records demonstrating the dog's reliability in the field, the government had failed to prove the dog's reliability sufficient to support probable cause to search the vehicle. The Sixth Circuit, however, affirmed the District Court's order denying the defendant's motion to dismiss on the ground that evidence was presented that the dog was trained and certified as a drug dog and that the dog's handler sufficiently testified as to the dog's training and reliability. *Id.* at 395-96.

In the instant case, Det. Johnson testified that arrest reports of separate traffic stops listed on his traffic log would indicate the reasons for a particular arrest and whether Brondo had alerted on the vehicle. Det. Johnson also admitted, however, that if Brondo had alerted but no contraband had been found, he (Johnson) may not have made any arrest at all. Thus, argues defendant, Johnson failed to maintain records of "false positives" which would bear on Brondo's reliability. Johnson disputed, however, defense counsels' contention that an alert without a subsequent finding of contraband would indicate Brondo has made a mistake. According to Johnson, a drug dog can detect the odor of contraband in an area where contraband was located several hours earlier but is now gone. Johnson has extensive training and experience in using drug dogs and the undersigned considers him an expert in this field. No other expert testified to the contrary. Thus I conclude that even if Johnson had kept such detailed logs regarding his use of Brondo in the field, those logs would not necessarily have been an accurate indicator of Brondo's reliability. Johnson testified about Brondo's extensive experience, his weekly training and his successful certification at least four years in a row by the National Narcotic Drug Dog Association. Brondo has spent the last year in the employ of the Defense Department in Iraq as a

tracker and explosives detector. I conclude that Brondo is a reliable drug dog trained to detect contraband.

As for Det. Johnson's credibility, I heard the testimony concerning District Attorney General Estes' letter. I observed Det. Johnson's demeanor during the hearing, and I heard Special Agent Paris Gillette's testimony concerning the TBI investigation of Det. Johnson. Since the TBI has found no merit in the allegations against Det. Johnson, neither do I. I conclude Brondo's alert, not once but twice on the defendant's car gave police probable cause to search it. Once probable cause existed to search the vehicle, it was unnecessary to obtain a search warrant. *California v, Carney*, 471 U.S. 386, 390-94 (1985); *Carroll v. United States*, 267 U.S. 132 (1925); *United States v. Haynes,* 301 F.3d 669, 677-78 (6th Cir. 2002); *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998); *United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994). Thus, the defendant's Fourth Amendment rights were not violated when police searched his vehicle.

## IV. CONCLUSION

For the reason stated herein, it is RECOMMENDED defendant Clifton Omar Robinson's motions to suppress (Doc. Nos. 18, 20, and 30) be DENIED.[2]

ENTER:

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).